## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **CLINTON RILEY,** | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| **v.** | ) |
| | ) **Case No.:** 2:23-cv-12518 |
| **ROCKET MORTGAGE, LLC,** | ) |
| | ) **Hon.** |
| | ) |
| *Defendant*. | ) |
| | ) |

## COMPLAINT AND JURY DEMAND

Plaintiff Clinton Riley, by and through undersigned counsel, files this civil action and demand for jury trial against Defendant Rocket Mortgage, LLC for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. (ADA), the Family Medical Leave Act of 1993, 29 U.S.C. 2601, *et seq*. (FMLA), the Michigan Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq*. (PDCRA), and the Michigan Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*. (ELCRA).

### JURISDICTION

1.     The Court has jurisdiction over this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

2.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331

1

because Riley's claims arise under the laws of the United States.

3.      Jurisdiction is proper because Plaintiff has exhausted his administrative remedies.

4.      Venue lies in this Court pursuant to 28 U.S.C. § 1391 because the unlawful employment practices alleged in this action took place in Plymouth, Michigan, and Detroit, Michigan where Defendant is headquartered.

## PARTIES

5.      Plaintiff is a resident of Lincoln Park, Michigan, and was employed by Defendant from in or about 2009 until December 5, 2022.

6.      Defendant is a Michigan limited liability company with its principal place of business in Detroit, Michigan.

## ADMINISTRATIVE EXHAUSTION

7.      On June 5, 2023, Riley timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and cross-filed it with the Michigan Civil Rights Commission (MCRC).

8.      On July 21, 2023, the EEOC issued Riley a notice of right to sue.

9.      The Court has jurisdiction over this action because Riley has exhausted his administrative remedies.

## FACTUAL ALLEGATIONS

10.     Riley began working for Rocket Mortgage in or about 2009 as a

mortgage banker. Rocket Mortgage was named Quicken Loans at that time.

11.     Riley suffers post-traumatic stress disorder.

12.     Riley consistently received positive feedback on his written performance evaluations during his employment with Rocket Mortgage.

13.     Rocket Mortgage promoted Riley to operations director in or about 2014.

14.     Rocket Mortgage promoted Riley to divisional vice president in 2016, and he began working for Heather Lovier, Rocket Mortgage's executive vice president of operations.

15.     Lovier asked Riley about his dating life after he began reporting to her, and Riley responded that he was in a long-term relationship, was not married, and did not have children. In response Lovier told Riley that she considered him "one of those guys" and told him that, accordingly, she did not trust Riley because she believed he was a man who did not commit to women and did not have children.

16.     Thereafter Lovier consistently acted in an aggressive manner towards Riley, frequently raising her voice at him and threatening him in the course of their work together and in front of Riley's co-workers and subordinates. For example, Lovier frequently called Riley "stupid" and leveled other insults at him. Lovier's hostile behavior toward Riley triggered his post-traumatic stress.

17.     In or about March 2018, Lovier named Riley interim vice president of training for the duration of current vice present of training's, Ebony Stone's, FMLA leave. Lovier derided and yelled at Riley for Stone's team's shortcomings while Stone was on FMLA leave, despite his only having been in the interim position for three weeks.

18.     Lovier also directed Riley to implement long term changes to the training division while Stone was out despite Lovier's not telling Stone about these changes. Stone subsequently blamed Riley when she returned from FMLA leave.

19.     Riley complained to Tony Dunn, a Rocket Mortgage vice president, that Lovier had acted this way towards him, and Dunn responded that Lovier was testing Riley to determine how much stress he could handle. Thereafter Dunn and Riley agreed that Lovier's abusive and belittling style of communication adversely impacted Riley due to his PTSD.

20.     Riley also reported to Stone that Lovier had been rude and disrespectful to him and reported that Lovier's behavior triggered his trauma. Stone subsequently advised Riley that he "might have problems communicating that" at a "VP level."

21.     Riley applied for a promotion to a vice president position in November 2019, and Lovier interviewed Riley for the position. However, Lovier did not ask for Riley's resume or ask him any substantive questions during the

interview, but instead asked Riley about his dating life, specifically whether he was still in his long-term relationship. Riley disclosed that he was no longer in a relationship, and Lovier told Riley that Riley was purportedly "playing the field" and then told Riley that, accordingly, he was not ready for a vice president position.

22.     In or about March 2020 the president of Rocket Mortgage, Bob Walters, became dissatisfied with the performance of the firm's product team and demanded that Rocket Mortgage's vice president of product, Jeff Kvalalog, hire a product manager to improve the team's performance.

23.     Accordingly, Kvalalog, Dunn, and Austin Neimec, an executive vice president, asked Riley to move to the product team and become a product manager in recognition of his exemplary performance. Riley accepted the lateral transfer contingent on his ability to return to the divisional vice president of operations position if the new position did not work out.

24.     Rocket Mortgage only afforded Riley only one day of training despite promising to provide several months of training, and shortly after Riley became product manager he was unable to accomplish his job duties because the position required extensive travel and he was constrained by travel restrictions in place due to the COVID-19 pandemic.

25.     Riley asked Dunn and Lovier for his divisional vice president of

operations position back after two months in the product manager role without training and without the ability to accomplish anything in his role due to travel restrictions.

26.     Lovier responded by angrily asking Riley what he wanted, telling him that she was tired of moving him around.

27.     Thereafter Riley reported to Dunn that Lovier that Lovier would accuse Riley of lying when he tried to correct her, behavior that triggered a trauma response due to his PTSD.

28.     Dunn then spoke to Lovier, and Lovier agreed to reinstate Riley back to his divisional vice president of operations position, with a start date in August of 2020.

29.     Lovier assigned Riley to the group within the operations division with one of the lowest performance metrics, the vendor operations group, in August 2020, upon Riley's resumption of his role. Riley advised Lovier that he could turn the group around in several months, based on his man-hour calculations, but Lovier told Riley that he had weeks to solve the group's problems.

30.     Walters began to follow the progress of the vendor operations team closely in or about September 2020, and he asked for progress updates on Riley's efforts.

31.     Lovier began to misrepresent to Walters Riley's progress in response

to Walter's interest, and she also manipulated the vendor operation team's internal data to reflect faster progress than what was being made.

32.     Lovier also began to issue negative feedback based on false or misinterpreted information, and she emailed Riley late at night, calling Riley or his work "disgusting" and "embarrassing."

33.     In response Riley told Lovier that her behavior was not healthy for him, that her insulting style of communication broke him down and demoralized him, and he advised her of the trauma and abuse that he had suffered and his PTSD.

34.     Lovier's hostility towards Riley was so blatant that several of Riley's subordinates declared that they never wanted to be promoted if it meant being subjected to Lovier's emotional abuse.

35.     In or around October 2020, Riley told his new supervisor, Kelly Zaske, that he needed her help in keeping Lovier from insulting him so that he could focus on improving his team's performance. Riley advised Zaske that Lovier's behavior affected him so much because it was reminiscent of his earlier trauma and that Lovier was aware of Riley's trauma and that she continued to intentionally act in a hostile manner toward him accordingly. In response Zaske told Riley that she was shocked by Lovier's behavior and would attempt to speak to her.

36.     Thereafter, Lovier told Riley on or about October 21, 2020, that her hostile remarks were nothing compared to how Walters or Jay Farner would respond when client complaint emails that were "going to keep coming and coming" escalated to the senior executive level.

37.     Walters began to aggressively interrupt Riley with demeaning questions during Riley's presentation in a meeting between Riley's team, Lovier, Walters, and Riley's new supervisor, Tracy Zobel, in or around December 2020.

38.     At one point Riley asked Walters to let him answer one question before interrupting with the next, and in response Walters called Riley and his team "communists" who were "dogs just wagging your tails." Walters looked physically upset and raised his voice.  His behavior triggered Riley's trauma response and forced Riley to recompose himself mentally before he could continue his presentation.

39.     Two participants in the meeting, Sara Amos and Kelly Bobosky, stepped down from their positions as division vice presidents after the meeting.

40.     Bobosky told Riley that Walters' behavior was why she was stepping down, as she could not handle it anymore. Ryan Myers, one of Riley's co-workers, told Riley that he was worried that Walters would physically assault Riley.

41.     Zobel called Riley two business days later to tell him that, although Riley did not do anything wrong, Riley needed to learn how to deal with Walters'

"quirks."

42.     Following this meeting, Riley reported to Krystal Lawrence, Riley's human resources representative at Rocket Mortgage, Lovier's and Walters' behavior and comments and the effect their behavior was having on his mental health.

43.     In or about January of 2022 Riley applied again for a vice president position and interviewed for the position on January 24, 2022. Later that week Lovier announced that Rocket Mortgage selected someone else.

44.     On or about February 4, 2022, Lovier and Dunn spoke to Riley regarding the promotion opportunity and areas for Riley to improve, and Lovier referenced the meeting with Walters as an example.

45.     Riley responded that he believed the meeting with Walters did not go well because Walters was highly unprofessional in the meeting and called Riley and others disparaging names during the meeting.  Riley was attempting to explain to Lovier that he felt physically threatened by Walters' behavior during the meeting when she interrupted Riley and told him "I'm going to stop you here because you need to know when to shut your mouth."

46.     Lovier also told Riley that he would not be advancing in his career and that he had a few months to figure out his place in the organization. Lovier told Riley that his "shitty attitude was wasting my time" even though Riley had never

received any written negative feedback in any of his performance evaluations, nor had he ever been disciplined.

47.    In February and March 2022, Riley's mental health declined in response to Lovier's continued hostility to Riley, as well as the February 4, 2022, conversation. In response to his symptoms of mental decline, Riley scheduled an appointment with his physician.

48.    On March 24, 2022, Riley's physician told him his symptoms were indicative of severe depression, anxiety, and stress and recommended his taking time off of work to seek mental health treatment for his mental disability.

49.    Riley informed Lawrence and Myers on March 25, 2022, that he needed to take medical leave due to his mental disability, and in response Myers told Riley to use his accrued paid time off rather than mentioning that he was eligible for FMLA leave.

50.    In or about April 2022 Riley noticed that he was not being paid despite taking paid time off, and he contacted Ayanna Hill, Rocket Mortgage's leave of absence specialist, who told him that he could not use his paid time off and would need to file with insurance. Hill also told Riley that Rocket Mortgage would only cover 60% of his salary. Riley asked if the other 40% could be covered by his PTO hours, and Hill initially refused but then gave Riley special permission to supplement his leave with PTO hours. Thereafter Riley commenced three

months of FMLA leave.

51.     On or about April 29, 2022, Dunn called Riley while he was on FMLA leave to state that Rocket Mortgage was looking for volunteers to resign their positions in exchange for a severance package. Riley responded that it was inappropriate to ask for his resignation while he was on protected leave and refused to resign.

52.     On or about December 2, 2022, Riley informed Hill, Myers, Dunn, and Rocket Mortgage's senior vice president, Scott King, that he was ready to return to work, and Hill advised Riley that his return-to-work date would be December 6, 2022.

53.     Hill arranged for Riley to be given a new laptop, badge, and other equipment, as Rocket Mortgage had upgraded its technology during Riley's absence. Rocket Mortgage gave Riley a tracking number for the shipment.

54.     On December 5, 2022, Riley reported to Hill that he had not received the package and that the tracking information reflected only that the label had been printed without any further action., and Hill then replied that Lovier had attempted to reach Riley. Later that day Lovier informed Riley that he was terminated because there was "no room" for him at work.

55.     As the result of Rocket Mortgage's illegal actions, Riley has sustained mental anguish and economic damages, and he will continue to sustain damages

into the future.

## COUNT I
### Discrimination Based on Disability
### in Violation of the Americans with Disabilities Act

56.     Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

57.     Defendant unlawfully discriminated against Plaintiff on the basis of his disability.

58.     The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*. makes it unlawful for an employer to discriminate against any individual with respect to his terms, conditions, or privileges of employment because of his disability.

59.     Plaintiff is a disabled individual under the ADA.

60.     Plaintiff is a qualified individual under the meaning of the statute.

61.     Defendant discriminated against Plaintiff when it subjected him to abuse and terminated him.

62.     As a result of Defendant's violations, Plaintiff has suffered loss of income, loss of his career, damage to his professional and personal reputation, mental anguish and other economic and compensatory damages; he will continue to suffer these damages into the future.

## COUNT II
**Retaliation**
**in Violation of the Americans with Disabilities Act**

63.     Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

64.     Defendant unlawfully retaliated against Plaintiff based on his protected activity.

65.     The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*., makes it unlawful for an employer to retaliate against any individual with respect to his protected or operational activity reporting or preventing disability discrimination.

66.     Plaintiff reported to multiple members of Rocket Mortgage that Lovier and Walters' behavior triggered a trauma response based on abuse and prior trauma.

67.     Defendant retaliated against Plaintiff when it terminated him after he had conducted protected and oppositional activity.

68.     Any asserted reason for this mistreatment is illegitimate pretext for unlawful discrimination.

69.     As a result of Defendant's violations of the ADA, Plaintiff has suffered loss of income, loss of his career, damage to his professional and personal reputation, mental anguish and other economic and compensatory damages; he will

continue to suffer these damages into the future.

## COUNT III
### Discrimination Based on Disability in Violation of
### the Michigan Persons with Disabilities Civil Rights Act,
### MCL 37.1101 *et seq*. (PDCRA)

70.     Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

71.     Defendant unlawfully discriminated against Plaintiff on the basis of his disability.

72.     The Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq*., makes it unlawful for an employer to discriminate against any individual with respect to his terms, conditions, or privileges of employment because of his disability.

73.     Plaintiff is a disabled individual under the PDCRA. His post-traumatic stress, depression, and anxiety impact several aspects of his daily life.

74.     Plaintiff is a qualified individual under the meaning of the statute. He was a longtime employee who had no attendance issues and consistently received good performance evaluations.

75.     Defendant discriminated against Plaintiff when it terminated him while he was treating his disabilities.

76.     Defendant also discriminated against Plaintiff when it subjected him

to a work environment hostile to anyone with post-traumatic stress.

77. Any asserted reason for this mistreatment is illegitimate pretext for unlawful discrimination.

78. As a result of Defendant's violations of the PDCRA, Plaintiff has suffered loss of income, loss of his career, damage to his professional and personal reputation, mental anguish and other economic and compensatory damages; he will continue to suffer these damages into the future.

## COUNT IV
### Retaliation in Violation of
### the Michigan Persons with Disabilities Civil Rights Act,
### MCL 37.1101 *et seq*. (PDCRA)

79. Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

80. Defendant unlawfully retaliated against Plaintiff based on his protected activity.

81. The Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq*. makes it unlawful for an employer to retaliate against any individual with respect to his protected or operational activity reporting or preventing disability discrimination.

82. Plaintiff reported to multiple members of Rocket Mortgage that Lovier and Walter's behavior triggered a trauma response based on abuse he

suffered.

83.     Defendant retaliated against Plaintiff when it terminated him after he had conducted protected and oppositional activity.

84.     Any asserted reason for this mistreatment is illegitimate pretext for unlawful discrimination.

85.     As a result of Defendant's violations of the PDCRA, Plaintiff has suffered loss of income, loss of his career, damage to his professional and personal reputation, mental anguish and other economic and compensatory damages; he will continue to suffer these damages into the future.

**COUNT V**
**Interference in Violation of**
**The Family and Medical Leave Act**

86.     Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

87.     At all times relevant to this complaint, Riley was a "person" and an "employee" as defined by 29 U.S.C. § 2611(2)(A).

88.     At all times relevant to this complaint, Rocket Mortgage was an "employer" as defined by 29 U.S.C. § 2611(4)(A). During all relevant times, Rocket Mortgage controlled the terms and conditions of Riley's employment.

89.     Riley was eligible to take FMLA leave as he had been an employee for longer than 12 months prior to requesting leave in or around March 2022.

90.     The FMLA makes it unlawful for an employer to deny or misdirect an employee from using his protected FMLA leave as long as he is eligible.

91.     Rocket Mortgage denied Riley FMLA benefits when in or about March 2022, it directed Riley to use his paid leave or his partially paid insurance-provided leave rather than informing him that he was eligible for FMLA leave, and then terminated him while he was still on the same leave in which Riley did use FMLA leave.

92.     A causal connection exists between Riley's protected activity and Riley's termination, as evidenced by the fact that Rocket Mortgage knowingly terminated him during his leave that included FMLA leave.

93.     Adverse actions were taken against Riley, in whole or in part, because he exercised his rights under the FMLA, and he engaged in protected activity.

94.     Rocket Mortgage's stated reasons for terminating Riley are pretextual.

95.     Riley sustained and is continuing to sustain damages as the result of the Defendant's illegal actions in violation of the FMLA.

<div align="center">

**COUNT VI**
**Retaliation in Violation of**
**The Family and Medical Leave Act**

</div>

96.     Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

97.     At all times relevant to this complaint, Riley was a "person" and an

"employee" as defined by 29 U.S.C. § 2611(2)(A).

98.    At all times relevant to this complaint, Rocket Mortgage was an "employer" as defined by 29 U.S.C. § 2611(4)(A). During all relevant times, Rocket Mortgage controlled the terms and conditions of Riley's employment.

99.    The FMLA makes it unlawful for an employer to adversely act upon an employee due to the employee's use of FMLA leave.

100.    Riley engaged in protected activity under the FMLA when he took FMLA leave in or around March 2022 and continued that same leave using other types of leave.

101.    For the purpose of the retaliation provision of the FMLA, mixed leave that uses FMLA leave is protected.

102.    Rocket Mortgage adversely acted on Riley when it terminated his employment while he was still on leave that was in part FMLA leave.

103.    A causal connection exists between Riley's protected activity and Riley's termination, as evidenced by the fact that Rocket Mortgage knowingly terminated him during his leave that included FMLA leave.

104.    Riley sustained and is continuing to sustain damages as the result of the Defendant's illegal actions in violation of the FMLA.

**COUNT VII**
**Discrimination Based on Marital Status**
**in Violation of Elliott–Larsen Civil Rights Act (ELCRA)**
**M.C.L. § 37.2101 *et seq*.**

105.   Plaintiff adopts and incorporates by reference the averments of the preceding paragraphs as if fully set forth herein.

106.   Defendant unlawfully discriminated against Plaintiff on the basis of his marital status.

107.   The Michigan Elliott–Larsen Civil Rights Act (ELCRA), M.C.L. § 37.2101 *et seq*., makes it unlawful for an employer to discriminate against any individual with respect to his terms, conditions, or privileges of employment in part because of his marital status.

108.   Plaintiff is a protected individual under ELCRA because he is unmarried without children.

109.   Lovier showed a preference for married men with children and told Riley that she did not trust him or believe he was ready for a promotion due to the fact he was unmarried and without children.

110.   Rocket Mortgage's stated and forthcoming reasons for terminating Riley are pretextual.

111.   Riley has suffered and will continue to suffer damages as a result of Rocket Mortgage's unlawful actions.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff respectfully requests that he be awarded the following relief:

a.  Judgment against Defendant in an amount of any wages, salary, employment benefits, or other compensation denied or lost to Riley, including economic damages, liquidated damages, compensatory and punitive damages to be determined at trial;

b.  Re-employment, reinstatement, promotion, front pay, or other equitable relief;

c.  Pre-judgment interest;

d.  Interest due on unpaid wages;

e.  A reasonable attorney's fee and costs of this litigation;

f.  Injunctive and declaratory relief; and

g.  Reasonable expert witness fees;

h.  Any other relief that this Honorable Court deems just and proper to award.

## JURY DEMAND

Plaintiff demands a jury for all issues proper to be so tried.

<div style="margin-left:40%">

Respectfully submitted,

/s/ David M. Blanchard
David M. Blanchard (P67190)
Blanchard & Walker PLLC
Local Counsel for Plaintiff
221 N. Main Street, Ste 300
Ann Arbor, MI   48104
(734) 929-4313 (telephone)
blanchard@bwlawonline.com

</div>

R. Scott Oswald, Esq.
John T. Harrington *(application for admission forthcoming)*
The Employment Law Group, P.C.
1717 K Street NW, Suite 1110
Washington, D.C. 20006-5345
(202) 261-2830 (telephone)
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
tharrington@employmentlawgroup.com
*Counsel for Plaintiff*

Dated:  October 5, 2023